2012 UT 90

**UTAHNS FOR ETHICAL GOVERNMENT, a Utah political issues committee, Plaintiff, Appellant and Cross-Appellee,**

v.

**Clerks Of All Counties in the State of Utah; GREG BELL, in his official capacity as Lieutenant Governor of the State of Utah; AND MARK SHURTLEFF, in his official capacity as Attorney General of the State of Utah, Defendants, Appellees and Cross-Appellants.**

Nos. 20120594, 20120608.

Supreme Court of Utah.

Dec. 14, 2012.

---

7. *In re Stewart* discussed a predecessor of Sec- tion 103. We refer to Section 103 for clarity.

Allen L. Smith and David R. Irvine, Salt Lake City, for plaintiff.

Bridget K. Romano, Utah Solicitor Gen., Thom D. Roberts, Asst. Att'y Gen., and Melanie F. Mitchell, Salt Lake City, for defendants.

Justice LEE, Opinion of the Court:

¶ 1 Utahns for Ethical Government (UEG) is a Utah political action committee. Its activities focus on ethics reform in Utah, including a petition for an initiative to be included on the ballot for the statewide general election. Before UEG began gathering signatures on its petition, it asked the Lieutenant Governor to allow it to utilize a petition targeting both the 2010 and 2012 ballots. The Lieutenant Governor denied this request and required UEG to advance a petition targeting only a single ballot. UEG did not contest the Lieutenant Governor's decision at that time. It instead began collecting signa-tures on a petition targeting only the 2010 ballot.

¶ 2 Ultimately, UEG's efforts to qualify for the 2010 ballot were unsuccessful. Yet it continued collecting additional signatures thereafter—still using the same petition targeting 2010. In so doing, UEG believed it could qualify its initiative for the 2012 ballot by combining the additional signatures it gathered for the 2012 ballot with the signatures it had previously gathered for the 2010 ballot.

¶ 3 The Lieutenant Governor subsequently determined that UEG's initiative did not qualify for the 2012 ballot, reasoning, in part, that the initiative petition it advanced applied only to the 2010 ballot. UEG then filed this suit, seeking a court order compelling placement of its proposed initiative on the 2012 ballot. After UEG's efforts at the district court proved unsuccessful, UEG both appealed and petitioned this court for extraordinary relief.

¶ 4 On July 31, 2012, we issued an order denying UEG the relief it sought, noting that an explanatory opinion would follow. This opinion explains our earlier order. We hold that UEG was not entitled to have its initiative included on the 2012 ballot because UEG gathered signatures on a petition targeting only the 2010 ballot. UEG's use of such a petition, in other words, made it practically impossible for UEG to meet its burden of demonstrating that its initiative qualified for the 2012 ballot. We resolve the case on that basis without reaching a range of legal issues briefed by the parties.

I

¶ 5 On August 12, 2009, twelve co-sponsors filed an application with the Lieutenant Governor seeking to place an ethics reform initiative on the general election ballot. UEG was formed to represent these sponsors and facilitate the achievement of their goal.

¶ 6 UEG hoped it would be able to obtain enough petition signatures to qualify the sponsors' proposed initiative for inclusion on the 2010 ballot.[1] Yet it asked the Lieutenant

---

1. This was not an insignificant undertaking. Soon after submitting their application, the spon-

Governor to allow its petition to target, alternatively, both the 2010 and 2012 ballots.

¶ 7 The Lieutenant Governor denied UEG's request and required UEG's petition to target only one ballot. UEG did not contest that decision at that time; it instead began gathering signatures, using a petition targeting only 2010. That is, UEG gathered signatures on packets and signature sheets expressly identifying the 2010 ballot as the target election.

¶ 8 On April 15, 2010, as required by statute, UEG submitted the signatures it had collected to each of the various county clerks. Thereafter, each clerk's office performed the process of verification—ensuring that each initiative signer was a Utah resident, over eighteen years of age, and a registered voter in Utah. Once this verification process was complete, the clerks then delivered the certified packets to the Lieutenant Governor.

¶ 9 In June 2010, the Lieutenant Governor determined that UEG lacked adequate signatures for placement of its initiative on the 2010 general election ballot, and accordingly entered a declaration of insufficiency. Specifically, the Lieutenant Governor determined that UEG had gathered only 73,244 valid holographic signatures, well short of the 94,552 threshold. Thus, UEG's attempt to qualify the sponsors' initiative for inclusion on the 2010 ballot failed.

¶ 10 Despite this initial failure, UEG continued its signature-gathering efforts thereafter. UEG planned to use the additional signatures it gathered—in addition to those already amassed during its failed attempt to qualify for the 2010 ballot—to qualify its initiative for the 2012 ballot. UEG believed it was statutorily entitled to continue gathering signatures for the 2012 ballot until August, 12, 2010—one full year after the sponsors' initial application had been filed.[2]

sors asked the Lieutenant Governor to inform them how many signatures they would need to gather in order to meet the relevant statutory qualification requirements. The Lieutenant Governor informed them that they would need to gather at least 10 percent of the vote count (statewide and for all 29 senate districts) of the 2008 gubernatorial election in Utah, which amounted to an aggregate minimum of at least 94,552 valid signatures.

¶ 11 The Lieutenant Governor allowed the county clerks to informally process and count the additional signatures UEG gathered between April 15, 2010 and August 12, 2010. But the Lieutenant Governor instructed the clerks not to certify these signatures. In the Lieutenant Governor's view, UEG was not entitled to use petitions targeting 2010 to qualify for the 2012 ballot. On that ground, the Lieutenant Governor informed UEG that its initiative did not qualify for the 2012 ballot in a letter dated March 21, 2011.

¶ 12 Undaunted by this further setback, UEG filed a complaint in Third District Court on March 21, 2011 against the clerks of all the counties of the state, the Lieutenant Governor, and several other defendants. UEG's complaint challenged the Lieutenant Governor's refusal to place UEG's initiative on the 2012 ballot, and asked the court to require the Lieutenant Governor do so.

¶ 13 The Lieutenant Governor filed a motion for summary judgment on December 29, 2011. This motion asked the court to dismiss UEG's complaint because "the initiative petition which is the subject matter of the litigation did not qualify, has not qualified, and cannot now qualify for placement on the ballot ... in a manner that complies with the ... requirements of the initiative laws." UEG contested the Lieutenant Governor's motion by insisting that UEG had complied with the relevant statutes—by gathering sufficient signatures during the one-year period UEG believed these statutes afforded it. UEG also moved for partial summary judgment based on its contention that, with the anticipated verification of e-signatures it had collected during the one-year statutory period, it had gathered enough signatures to qualify its initiative for the 2012 ballot.

2. At the same time, UEG clearly understood that the Lieutenant Governor did not share this belief. Vik Arnold, a UEG officer and executive committee member, explained that "[a]t the time" when the Lieutenant Governor declared UEG's initiative insufficient, "UEG took this declaration to mean ... that the Lieutenant Governor, consistent with his prior actions, was taking steps and being proactive in making sure that the UEG initiative would be killed and buried."

¶ 14 The district court denied both of these motions for summary judgment on June 6, 2012, concluding that UEG did have a full year from the date on which its application with the Lieutenant Governor was filed in which to gather signatures, but that UEG was not entitled to use the e-signatures that it had gathered. The district judge certified his order denying these motions as final under rule 54(b) of the Utah Rules of Civil Procedure.

¶ 15 Both UEG and the Lieutenant Governor appealed. Thereafter, subsequent proceedings involving other, still-disputed legal issues were held in the district court. The district court ultimately resolved the case in favor of the Lieutenant Governor in an Order and Final Judgment dated July 3, 2012. UEG filed a petition for extraordinary relief challenging aspects of the district court's July 3 order. We consolidated the appeals and petition for extraordinary relief. On July 31, 2012, we issued an order denying UEG the relief it had requested. This opinion explains our July 31 order.

## II

¶ 16 UEG's principal contention on appeal is that it gathered enough signatures on the petition it circulated targeting the 2010 ballot to qualify its initiative for the 2012 ballot. In advancing that contention, UEG raises a range of legal issues on which the parties disagree, such as the length of time prescribed by statute to gather signatures, and whether our statutes limit an initiative petition to a specific calendar year.

¶ 17 We reach none of these other issues because UEG's contention falters on a fundamental factual ground. Because UEG gathered signatures on a petition targeting only the 2010 ballot, UEG cannot carry its burden of showing that it obtained sufficient signatures to qualify for the 2012 ballot.

## A

¶ 18 "A person seeking to have an initiative submitted to a vote of the people for approval or rejection" has the burden of obtaining a sufficient number of "legal signatures." UTAH CODE § 20A-7-201(2)(a) (2010). That burden, in turn, clearly—if implicitly—entails proof that the signatures in question indicate support by the signer of a specific initiative's inclusion on a particular ballot "for approval or rejection" by the voters. *See id.; see also id.* § 20A-7-203(1)(a) (2010). After all, the "necessary number of signatures" must be "obtain[ed]" by "circulat[ing] initiative packets" that include "a copy of the initiative petition," *see id.* § 20A-7-204(1)–(2) (2010), and it is this petition that the signers sign, *see id.* § 20A-7-203(1)(a) (2010).

¶ 19 The terms of the particular petition signed by the voters are accordingly critical. The petition's terms delimit the practical significance of signatures to it by indicating what a signer agrees to by signing. *See, e.g., id.* (illustrating that, under the form petition that must be "substantially" followed, a petition signature indicates the signer's agreement that a "proposed law" should be "submitted to the legal voters ... of Utah for their ... approval or rejection"). If the terms of the petition do not clearly identify the initiative under consideration or the ballot on which it is proposed to be included, the signatures on the petition cannot meaningfully be counted as relevant signatures under the statutory scheme—as signatures, in other words, indicating support for a specific initiative's inclusion on a particular ballot "for approval or rejection" by the voters. *See id.; see also id.* § 20A-7-201(2)(a) (2010).

¶ 20 Thus, the burden prescribed by statute is not just the gathering of a sufficient number of valid "legal signatures" by registered voters. To be relevant, the signatures must reliably indicate support for inclusion of a particular initiative on a particular ballot. An initiative proponent who collected signatures of every voter in the state on a blank petition, for example, would not meet the requirements of the statute. Every signature on that petition could be "legal" in the sense of coming from a registered voter, but the initiative would fail to satisfy the statute because there would be no way to tell whether the signers supported the inclusion of any particular initiative on any particular ballot.

¶ 21 UEG cannot carry its burden under the statute. The petition at issue contained a certain number of "legal signatures," but

there is no way to tell whether those signatures indicate support for including the proposed initiative on the *2012 ballot.* Because the signatures appear on a petition proposing an initiative for the *2010 general election,* UEG cannot reliably demonstrate how many of those signatures are of continuing relevance for—or in other words indicate support for inclusion on the ballot for—the 2012 election.

¶ 22 Signatures on an initiative petition bear an implied expiration date. Political winds and legal conditions change from election to election, so there is no way to tell whether a voter who supports an initiative for one election season will continue to support it in a subsequent election. For some voters, the burning convictions fueling support for a 2010 ballot initiative could easily become snuffed out by the time the 2012 election rolls around. That could happen as a result of a political change of heart by individual voters. Or it could be affected by intervening changes in the representative incumbency at which the direct democratic initiative is aimed, or by amendments to the underlying fabric of the law that is the subject of the initiative.

¶ 23 Both such changes occurred between the 2010 and 2012 general elections in Utah. The 2010 election produced changes in the makeup of the Utah legislature generally and also in its leadership. And the legislature enacted reforms that overlapped with—and even incorporated in part—the ethics provisions set forth in UEG's petition.[3] We note these developments not to suggest that these changes would necessarily be enough to dissuade all voters from supporting UEG's petition, but just to suggest that, for some, they might be. And that fact is enough to undercut the probative value of the signatures submitted by UEG, as the courts are in no position to separate out the signatures of those who would continue to support the 2010 ballot initiative in 2012 from those who might not.

¶ 24 UEG acknowledged this general problem at oral argument. When asked whether the signatures gathered for the 2010 election could be recycled for submission of the initiative for the *2016 election,* counsel conceded the problem—acknowledging that signatures gathered on a petition targeting 2010 could not be used to qualify the initiative for the 2016 ballot. And when pressed as to why 2016 was different than 2012, moreover, counsel was unable to identify any principled distinction. Understandably. There is no meaningful distinction. Signatures on an initiative petition aimed only at the 2010 election provide legally viable support for inclusion of that initiative only on the 2010 ballot. Those signatures effectively expire once the 2010 election passes; there is no workable "grace period" extending for one additional election cycle and not others.

¶ 25 It is no answer to note, as UEG does here, that petition signers have a statutory right to request removal of their signatures if they subsequently change their minds. *See* UTAH CODE § 20A-7-205(3). That statutory right is relevant only insofar as the signer is aware of the ongoing effect of his signature. Individuals who signed a petition targeting only the 2010 election would have no reason to believe it necessary to seek removal of their names for the 2012 ballot, since they can be presumed to have known that the petition they signed was for the 2010 election. So the statutory right of removal is unhelpful here, and does nothing to address the lack of any reliable indication of the number of legal signatures supporting inclusion of the initiative on the 2012 ballot.

¶ 26 Nor do we find any basis in our precedent for a contrary approach. At oral argument in this case, UEG cited *Save Beaver County v. Beaver County,* 2009 UT 8, 203 P.3d 937, for the proposition that dates on initiative documents are "insignificant" and "inessential." *Cf. id.* ¶ 12. But *Beaver County* dealt with dates in the context of a

---

**3.** By way of example, UEG's ballot initiative proposed a legislative "Code of Conduct" that would prohibit all sitting legislators from "accept[ing] a gift from a lobbyist." Although the legislature did not completely ban the acceptance of gifts from lobbyists, in 2010 it passed section 36-11-

304, which states that, except for food, beverage, lodging, travel, or admission to certain events or meetings, "a lobbyist, principal, or government officer may not make or offer to make aggregate daily expenditures that exceed $10." UTAH CODE § 36-11-304.

referendum, not an initiative, *id.* ¶ 4, so that case is not controlling.

¶ 27 Referenda and initiatives are distinct in purpose and effect. While referenda target already-enacted statutes, initiatives are aimed at establishing new provisions of law. By analogy to the legislative process prescribed in article VI of our constitution, referenda are like a popular veto on laws passed by elected representatives. Initiatives, on the other hand, are like bills proposed during a legislative session. Of the two measures, initiatives are much more time-sensitive.

¶ 28 Because initiatives seek to generate new law they are presented at an early stage of the process, when legal and political processes have not yet run their course. For that reason, the propriety of an initiative can be affected by a wide range of possible intervening political or legislative developments, just as a proposed bill's viability can fluctuate between legislative sessions due to political or legislative shifts.

¶ 29 When a referendum petition is signed, on the other hand, most of the other relevant events in the lawmaking process have already occurred, so few intervening developments can directly affect the relevance of a particular referendum (e.g., repeal or modification of the targeted law). This conclusion is reinforced by the governing statutory regime, which provides that Utah voters may seek to qualify a statewide referendum for the ballot only "before the law takes effect." *See* UTAH CODE § 20A–7–102. This provision ensures the continuing relevance of a proposed referendum by preventing an already-passed law from going into effect until it is submitted to the voters.[4] No comparable mechanism in the statutory regime governing initiatives ensures the continuing relevance

of initiatives. It is thus unsurprising that the governing statutory regime does not expressly require a target election date for statewide referenda, *see id.* § 20A–7–303, but appears to do so for initiatives, *see id.* § 20A–7–203.

¶ 30 We therefore reject UEG's argument that the election date identified on an initiative petition is irrelevant as a matter of law. In fact, UEG's own actions in this case belie the assertion that the date on the petition does not matter, as UEG itself asked the Lieutenant Governor to approve a petition targeting multiple elections (2010 and/or 2012).

¶ 31 We accordingly hold that UEG's petition fails at the threshold, in that UEG cannot bear its burden of persuasion under the statutory scheme. UEG's case is premised on a proposed inference from the mere presence of "legal signatures" on the face of an initiative petition. But the only inference that can properly be drawn from a signature on a petition is that the signer supports the terms of that petition. Anything further is mere speculation.

¶ 32 UEG has therefore failed to carry its burden of proof under the statute, and the Lieutenant Governor was accordingly entitled to judgment as a matter of law. We affirm final judgment against UEG on that ground.

### B

¶ 33 Our holding is unaffected by any of UEG's other arguments in this case. None of UEG's legal arguments could excuse its failure to meet its burden of showing that it gathered enough signatures to "qualify"[5] its initiative for the 2012 ballot.

---

4. The governing statutory regime for referenda also has another unique function indicating why a referendum target date may be less significant than an initiative one: All referendum signatures must be gathered and submitted during a relatively short period immediately following the passage of the law targeted by a referendum. *See* UTAH CODE § 20A–7–306(1) (providing only forty days after the end of the legislative session in which to gather signatures in support of statewide referenda); *id.* § 20A–7–606(1)(a) (providing only forty-five days in which to gather signatures in support of local referenda). This feature

of the governing regime ensures that referendum signatures cannot be recycled by referendum proponents across multiple election cycles. There is no similarly restrictive time limit imposed on initiative petitions.

5. The parties ascribe different meanings to the term "qualify," but their disagreement about this term relates to the stage in the petition-submission process at which qualification occurs, not the number of signatures needed to qualify a petition. Because UEG cannot show it ever

¶ 34 UEG argues, for example, that the Lieutenant Governor erred in rejecting its request for a petition targeting both the 2010 and 2012 ballots, and that this error may have precluded UEG from securing the signatures required by statute. But even assuming a legal error in the Lieutenant Governor's decision, that would not excuse UEG's failure to carry its burden in this case. The fact of the matter is that UEG collected signatures on a petition indicating a 2010 target date. Having done so, UEG cannot carry its burden of proving it gathered enough signatures to qualify its initiative for the 2012 ballot. That factual deficiency is fatal to UEG's claim—whether or not it might have succeeded if it had asserted an earlier challenge to the Lieutenant Governor's decision.

¶ 35 UEG's claim that it had a full year to gather signatures under section 20A–7–202(4)(a) (2010) is equally unavailing. It does not matter whether the initiative statutes normally afford parties a full year in which to gather signatures. Because UEG used a petition targeting only 2010, it would not matter whether UEG had a full year—or even a thousand—in which to gather signatures. The signatures UEG did gather are not probative of the signers' approval of the initiative for the 2012 election, and we accordingly rule against UEG without reaching the timing question raised in the briefs.[6]

¶ 36 The same goes for UEG's assertion that our ballot initiative statutes, including Utah Code section 20A–7–206(1) (2010), do not limit an initiative petition to a specific calendar year. Even if this is true in the abstract, it fails in the factual circumstances of this case. For reasons explained above, ballot initiatives are subject to a natural limitation: If a date appears on the face of a petition, this date *does* limit the petition to a single election cycle. Thus, even if petitions in general are not limited to a single election cycle, UEG's petition was inherently so-limited.

¶ 37 On these and other issues, we rule against UEG without rejecting (or even reaching) UEG's legal arguments. Such arguments are not properly before us, as UEG's petition falters on the basis of its threshold failure to carry its burden of proof.

III

¶ 38 Our July 31 order entered judgment against UEG on the ground that the Lieutenant Governor was entitled to judgment as a matter of law. That order was based on the reasons set forth above-that UEG cannot carry its burden of persuasion in this case of presenting signatures indicating support for inclusion of the initiative on the 2012 ballot.

Justice LEE authored the opinion of the Court, in which Chief Justice DURRANT, Associate Chief Justice NEHRING, Justice PARRISH, and Justice DURHAM joined.

gathered sufficient signatures, we have no occasion to determine the stage at which qualification might have occurred.

6. UEG's other arguments relating to (a) the propriety of counting e-signatures and (b) the appropriate measuring rod (e.g., number of voters in presidential election vs. number of voters in the gubernatorial election) for determining the sufficiency of the number of signatures gathered are likewise unhelpful to UEG. These arguments would matter only if UEG was entitled to use signatures gathered on a petition targeting 2010 to help show that its initiative qualified for 2012.